IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| KRISTOFER MIKAL WRIGHT, | CV 17-00090-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| YELLOWSTONE DEPUTY MIKE LINDER, CORRECTIONAL OFFICER MUNTER, CHRISTOPHER CARUSO, SAM BOFTO, TAMARA OWENS, JANET GRIFFIN, VANESSA READY, and VICTORIA SCOTT, | |
| Defendants. | |

Pending are Defendants Caruso, Ready, Scott, and Owens' First Motion for Summary Judgment (Doc. 55),[1] Defendant Linder's Motion for Summary Judgment (Doc. 66), Defendant Bofto's Motion for Summary Judgment (Doc. 73), Officer Munter's Motion for Summary Judgment (Doc. 76), and Defendants Caruso, Owens, Scott, and Vanessa's Motion to Compel (Doc. 78), Motion to Strike (Doc. 80), and Motion to Continue Deadline to File Motions (Doc. 82).[2]

---

[1] Defendant Janet Griffin joined this motion on January 7, 2020.  (Doc. 92.)

[2] Plaintiff Kristofer Wright has also filed a Motion for Reconsideration (Doc. 87) and Motion for Leave to File a Motion for Reconsideration (Doc. 88) with regard to Judge Watters's December 5, 2019 Order Denying Mr. Wright's Motion for Reconsideration.  The Court leaves those motions for Judge Watters's consideration.

The Court finds that Defendants are entitled to summary judgment and that this matter should be dismissed.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Summary judgment should be entered,

"after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate

that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notices provided on November 4, 2019 and December 12, 2019 (Docs. 54, 65, 72, 75), Mr. Wright was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

4

## II. FACTS[3]

On November 5, 2014, the United States arrested Mr. Wright and remanded

him to the Yellowstone County Detention Facility ("YCDF").  (Linder Statement

of Undisputed Facts, Doc. 68 (hereinafter "Linder SUF" at ¶ 2.)  At all times

relevant to his Complaint, Mr. Wright was housed at YCDF as a federal pretrial

detainee and in custody of the United States Marshals Service (USMS).

(Defendants Vanessa Ready, LPN, Victoria Scott, LPN, Christian J. Caruso, PA,

and Tamara Owens, LPN's Statement of Undisputed Facts, Doc. 56 (hereinafter

"Medical Defendants' SUF") at ¶ 2.)

It is undisputed that Mr. Wright was assaulted by Inmate Lester Runs

Above, but it not clear precisely when this assault occurred.  In his original

Complaint, Mr. Wright alleged Inmate Lester Runs Above assaulted him in the

early morning on December 2, 2014, and that by 8:00 p.m. the evening following

the beating he began to experience severe pain and discomfort.  (Complaint, Doc. 1

at 8.)  The Medical Defendants cite to Mr. Wright's December 4, 2014 inmate

complaint form which indicates the assault occurred on December 3, 2014 at about

7:10-7:15 p.m.  (Doc. 56-1.)  The County Defendants indicate the assault occurred

---

[3]Mr. Wright did not file a Statement of Disputed Facts as required by Local
Rule 56.1(b).  Therefore, Defendants' Statements of Undisputed Facts (Docs. 56,
68) are deemed admitted unless otherwise contradicted by the record.  L.R.
56.1(d).

on December 2, 2014, at approximately 5:45 a.m.  (Linder SUF at ¶ 3.)  The

Emergency Room records from December 5, 2014, however, indicate that Mr.

Wright reported that the assault occurred on Monday night, which would have

been December 1, 2014.  (Doc. 56-5 at 4.)

In any event, Mr. Wright reported the assault to Officer Shawn Munter, the

guard in the unit at the time.  Officer Munter locked down the unit and checked the

other inmates for swelling and abrasions on their knuckles.  (Linder SUF at ¶ ¶ 4,

5.)  When Mr. Wright identified Inmate Runs Above as the inmate who assaulted

him, Officer Munter confronted Runs Above, but Runs Above claimed Mr. Wright

initiated the assault and he defended himself.  (Linder SUF at ¶ 5.)  Officer Munter

transferred both Runs Above and Mr. Wright from the unit and placed Mr. Wright

in Classification D and Runs Above in Classification A.  (Linder SUF at ¶ 6.)

On December 4, 2014, Officer Munter called nursing and the on-call

medical provider to assess Mr. Wright.  (Linder SUF at ¶ 8.)  A December 4, 2014

5:08 a.m. report by Defendant Kimberly Baisch indicates,

> Nursing was called to unit this evening to assess IM who had been
> punched while in the bathroom.  This nurse found IM to be shaking
> and upset when she got to the unit.  Nurse assess IM and all vital signs
> were within normal limits. . . .  On-call provider Dr. Price was called
> and ordered Tylenol 500 mg, 2 tabs BID and an ice pack, both for 3
> days and stated IM needs to be seen in the clinic the next day.  Later
> in the evening after IM was moved to a different unit, nurse found
> IM's face to be already bruising extremely and IM in continued pain
> and upset he couldn't eat.  IM was given 2 cartons of milk.

(Doc. 56-4 at 4.)  The Action Taken part of the form indicates "Baisch, Kimberly 12/4/14 05:08:32 AM > Griffin, Janet 12/04/2014 02:11:58 PM" *Id.*

Defendant Nurse Janet Griffin also authored a medical note on December 4, 2014 at 10:16 a.m., which indicated she checked on Mr. Wright who reported he was still unable to open his mouth very far and that x-rays were ordered for his eye orbits and facial bones.  (Doc. 56-4 at 5.)

Mr. Wright confirmed in his December 4, 2014 "Inmate Complaint Form" that he was seen by a nurse who gave him an "ice pack and two Tylenol for pain." (Doc. 56-1, December 4, 2014 Inmate Complaint Form.)  He also stated that Officer Brennan brought him two milks and a new ice bag at about 6:00 a.m., and he saw the nurse again at around 7:30 or 8:00 a.m.  He asked to go to the hospital because he could not open his jaw, he was coughing up blood, and when he blew his nose his eyes would swell more shut.  He told the nurse that he could not open his jaw to eat.  He stated that an officer attempted to take him to Riverstone Health for x-rays, but they could not do them.  (Doc. 56-1 at 2.)

Nurse Griffin sent a message to Defendant Christian J. Caruso, PA who saw Mr. Wright the next day on December 5, 2014.  (SUF, ¶ 5).  PA Caruso indicated Mr. Wright reported "being assaulted approx. 2 days ago."  (Doc. 56-4 at 7.)  PA Caruso examined Mr. Wright and ordered x-rays.  X-rays were done on December 5, 2014 of Mr. Wright's mandible, orbits, chest, and facial bones, which identified

no fractures.  (Doc. 56-4 at 9-12.)  Mr. Wright indicated in his Amended

Complaint that the day after the assault PA Caruso told him his injuries "looked

fine and did not need outside help" and "nothing looks broken."  (Amended

Complaint, at 14.)

Mr. Wright was also taken to the Billings Clinic on December 5, 2014 at

11:21 a.m.  The Emergency Room Triage form indicated that Mr. Wright was

assaulted two days ago.  Dr. Curry examined Mr. Wright in the Emergency Room

and Mr. Wright reported being hit in the face, head, and neck.  Although he did not

report a loss of consciousness, he stated he had been suffering a mild headache

since the attack.  He also reported nausea, severe pain in his jaw, an inability to eat,

soreness on the left side of his neck, pain in his upper chest, and blurry vision.  Dr.

Curry ordered a head CT, maxillofacial and cervical spine CT's, and a CT scan of

the chest, abdomen, and pelvis with IV contrast.  She also consulted with three

other physicians regarding Mr. Wright's injuries, including ENT Robin Horrell,

M.D.   Dr. Horrell reported that the maxillofacial CT indicated:

> Comminuted fracture of the floor of the orbit.  The inferior rectus
> muscle body passes along the fracture (series 7 image 29).  No
> evidence of entrapment.

> Comminuted depressed fractures of the anterior and lateral walls of
> the left maxillary sinus  Small amount of fluid/blood in the maxillary
> sinus.  Moderate subcutaneous emphysema in the left face and
> bilateral in the upper neck including in the left periorbital region.

Mildly displaced fracture involving the left zygoma extending into the left zygomatic arch.

(Doc. 56-5 at 9.)

Dr Horrell did not feel that Mr. Wright needed immediate surgical intervention for his facial fractures.  (Doc. 56-5 at 6.)  He was prescribed Keflex, Cyclogyl, and ibuprofen for pain, and it was recommended that he follow-up with Dr. Horrell in 7 to 10 days.  (Doc. 56-5 at 4-6.)

Mr. Wright returned to YCDF from the hospital on December 6, 2014 at 2:26 a.m. with prescriptions for oral antibiotics, eye drops, and ibuprofen.  He was scheduled to see PA Caruso on December 8, 2014.  (Medical Defendants' SUF at ¶ 8; Doc. 56-4 at 13.)

PA Caruso assessed Mr. Wright on December 8, 2014.  Mr. Wright was to continue ibuprofen and acetaminophen for 10 days.  The clinical notes indicate "symptomatic improvement, pt now able to open mouth and eat, no diplopia, crepitus improving, pt has f/u scheduled with ENT in approx. 7 days, will f/u with pt at the end of the week, pt will kite to nursing with any worsening pain, HA, dyspnen or dysphagia."  (Doc. 56-4 at 14-15; (Medical Defendants' SUF at ¶ 9.)

PA Caruso also submitted a "Prisoner Medical Request" form to the USMS on December 8, 2014, indicating that Mr. Wright needed a follow-up appointment in 7-10 days with Dr. Horrell at the Billings Clinic.  At the bottom of the form was the following note, "per USMS, appt scheduled 1/2/15 or sooner if cancellation."

(Doc. 56-4 at 16; Medical Defendants' SUF at ¶ 10.)

Nurse Griffin wrote a note on December 12, 2014 indicating that she spoke with Mr. Wright the week prior as he was walking down the hallway.  She noted that the bruising on his eyes was much improved and that he said his pain was better and the ibuprofen and Tylenol were helping.  (Doc. 56-4 at 19; Medical Defendants' SUF at ¶ 2.)

Mr. Wright submitted a YCDF "Medical Request Form" dated December 13, 2014, stating that he could feel a bone on his left side about to come through his gum above his teeth that was not there before.  Mr. Wright was seen by Michael Downing, DDS at YCDF on December 16, 2014 regarding the complaint in his kite.  (Medical Defendants' SUF at ¶ 12.)  The response on the form indicated that an x-ray was taken of "#14" and no work was needed at that time.  (Doc. 56-4 at 20; Doc. 56-4 at 22.)

On December 15, 2014, Mr. Wright submitted a "Medical Request Form" indicating that he was told his "ibu's" ran out and he was still in quite a bit of pain from his injuries.  He asked if he could receive the "ibu's" on the cart and asked why he had not been back to see the doctor for a follow up at the ER.  (Doc. 56-4 at 21.)

On December 16, 2014, Nurse Kelly responded that he could get ibuprofen and Tylenol from the canteen.  She explained that he was never scheduled to go

back to the ER, and that they were following him there and the nurses were keeping the provider informed.  (Doc. 56-4 at 21.)

On that same date, he submitted an "Inmate Complaint Form," again complaining that he was no longer receiving ibuprofen from the nurse, and that he should not have to buy it if the assault was not his fault.  Nurse Kelly responded to this complaint as well.  She told Mr. Wright that his order for ibuprofen was for one week and if he needed more, he could buy it from the canteen.  She again told him he was never scheduled to follow up in the ER and that they were following him in the facility and the nurses were keeping the provider informed.  She stated, "Medical is not responsible for what happens on the units.  We provide medical care, and you have received excellent medical care for your injuries."  (Doc. 60-1 at 8.)

On December 16, 2014, Mr. Wright submitted another "Medical Request Form" and an "Inmate Complaint Form," indicating he was still having a lot of pain in his face, especially his left eye socket and that his jaw was still in pain.  He reiterated that he had a broken bone about to protrude though his gums and the dentist did not resolve this.  (Doc. 56-4 at 23; Doc. 60-1 at 9.)

PA Caruso saw Mr. Wright on December 17, 2014.  He continued Mr. Wright on ibuprofen and Tylenol for 21 days.  The clinical notes indicate,

> Continued improvement, pt now able to open mouth and eat, no
> diplopia, crepitus resolved.  Pts' f/u was delayed d/t DOC., confirmed

with Tracey Blake that DOC was contacted on 12/8/14, b/c inmate is federal RSH staff does not schedule f/u out of facility appointments. Pt scheduled for f/u with ENT on 1/2/15.  Pt will kit to nursing with any worsening pain, HA, dyspnea or dysphagia.

(Doc. 56-4 at 25.)

Mr. Wright also indicated that his blurry vision was worsening.  PA Caruso indicated "possible 2/2 globe trauma, reassuring pt is able to write without issue, I have reviewed pt's writings and they are quite legible.  Will treat as above, if no improvement after visit to ENT or if vision worsens, pt will likely need to be seen by opth."  PA Caruso scheduled a follow-up for two weeks.  (Doc. 56-4 at 25.)

Riverstone Health staff also followed-up with e-mails to the USMS on December 17, 2014 asking about the status of PA Caruso's December 8, 2014 request for a follow-up with Dr. Horrell.  The USMS responded, "Sorry about that. I am solo covering the whole state thru January and likely forgot to answer.  I was only able to get him an appointment for 1/2/2015.  The provider will contact me if there are sooner cancellations."  (Doc. 56-4 at 17.)

Mr. Wright was seen by Dr. Horrell on January 2, 2015, but there no treatment note from this visit in the record.  Mr. Wright was also seen by PA Caruso on the same date and his clinical notes indicated, "[c]ontinued improvement, improved jaw ROM, no diplopia, crepitus resolved, pt seen by ENT today, progress note is pending, will refer pt to ophthalmology in the meantime re: continued blurry vision."  (Doc. 56-4 at 27.)  PA Caruso also indicated that Mr.

Wright should be continued on ibuprofen and Tylenol and have a follow up in two weeks regarding blurry vision.  (Doc. 56-4 at 27.)

On January 5, 2015, PA Caruso prepared a "Prisoner Medical Request" form for a referral to ophthalmology regarding Mr. Wright's continued blurry vision. (Doc. 56-4 at 28.)  On January 5, 2015, Tracey Blake from the USMS responded that the request for ophthalmology exam was approved and would be scheduled sometime after his surgery.  (Doc. 56-4 at 29.)

Yellowstone County transported Mr. Wright to the Billings Clinic on January 7, 2015 for surgery.  (Medical Defendants' SUF at ¶ 2.)  The parties do not indicate what type of surgery was done, and there are no medical records in the record regarding this surgery.  The post-op visit record from January 16, 2015, however, indicates that Mr. Wright underwent a "ORIP – Left ZMC Fracture, trans oral approach."  (Doc. 56-5 at 12.)

After returning to YCDF, Mr. Wright requested an ice pack on January 9, 2015, which he was given by Defendant Owens.  Mr. Wright complained of swelling to Defendant Ready later that day and was provided his prescribed medications and another ice pack.  (Medical Defendants' SUF at ¶ 18.)  On January 12, 2015 Mr. Wright complained to Defendant Scott of pain.  Mr. Wright was out of the narcotic that he was prescribed, so Tylenol #3 was ordered. (Medical Defendants' SUF at ¶ 19.)

Yellowstone County transported Mr. Wright to the Billings Clinic on

January 16, 2015 for a post-surgery follow-up appointment.  PA Julia Marsik's

record notes Mr. Wright was "doing well.  Pain is well controlled."  Her record

further notes that Mr. Wright was "[p]rogressing as expected."  (Medical

Defendants' SUF at ¶ 20.)

On or about January 19, 2015, the USMS transferred Mr. Wright from

YCDF to Corrections Corporation of America.  (Doc. 11 at 4; Medical Defendants'

SUF at ¶ 21.)

## III.  ANALYSIS

The Court reviews pretrial detainee claims of inadequate medical care and

failure to protect under the Due Process Clause of the Fourteenth Amendment.  *See*

*Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (pretrial

detainee's inadequate medical care claim is analyzed under the Fourteenth

Amendment), *cert. denied*, 139 S. Ct. 794 (2019); *Castro v. City of L.A.*, 833 F.3d

1060, 1071 (9th Cir. 2016) (en banc) (pretrial detainee's failure to protect claim is

analyzed under the Fourteenth Amendment).

To state an inadequate medical care or a failure to protect claim arising

under the Fourteenth Amendment, a pretrial detainee must allege that (1) "the

defendant made an intentional decision with respect to the conditions under which

the plaintiff was confined"; (2) "those conditions put the plaintiff at substantial risk

14

of suffering serious harm"; (3) "the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved – making the consequences of the defendant's conduct obvious"; and (4) "by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125; *Castro*, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable . . .." *Gordon*, 888 F.3d at 1125 (*quoting Castro*, 833 F.3d at 1071).

Therefore, Mr. Wright must show that a defendant caused his injury by "purposely or knowingly" failing to protect or to provide adequate medical care, and this failure was "objectively unreasonable." *Castro*, 833 F.3d at 1069 (*quoting Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015)). Showing an officer's actual awareness of the substantial risk of harm is not required, but a pretrial detainee must "prove more than negligence but less than subjective intent— something akin to reckless disregard" *Castro*, 833 F.3d at 1071; *Gordon*, 888 F.3d at 1125.

## A. Failure to Protect

Mr. Wright has presented no evidence that any named defendant made an intentional decision with respect to his placement in the same area as Inmate Runs Above; that that placement put Mr. Wright at substantial risk of suffering serious

harm; that a defendant did not take reasonable available measures to abate that risk; or that by not taking such measures, a defendant caused Mr. Wright's injuries.

While Mr. Wright alleges in his Complaint that he was beaten for up to 50 minutes during which time no officer came to his rescue (Complaint, Doc. 1 at 8), he provides no evidence that any guard or named defendant was aware of the assault and failed to prevent or stop it.

Further, there is no evidence that Mr. Wright complained about the threat from Runs Above until after the assault. Mr. Wright alleges in his Amended Complaint that Inmate Runs Above threatened him, and thereafter others told him that Sheriff Linder was aware of and had fully documented that Runs Above was known to be violent and unstable. (Amended Complaint, Doc. 11 at 12-13.) While these allegations were sufficient to state a claim, they are not sufficient to overcome Defendants' motions for summary judgment.

While Mr. Wright indicated that other inmates told him the Sheriff was aware that Runs Above was known to be violent, those are inadmissible hearsay statements. A district court abuses its discretion if it considers evidence on summary judgment that is inadmissible hearsay or is not made on personal knowledge. *See Block v. City of L.A.*, 253 F.3d 410, 419 (9th Cir. 2001); *see also Himaka v. Buddhist Churches of America*, 917 F. Supp. 698, 704 (N.D. Cal. 1995) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient

to raise genuine issues of fact and defeat summary judgment.").  Mr. Wright does not allege that he has personal knowledge of Sheriff Linder's knowledge of Runs Above.  He also does not identify the individuals who allegedly made these statements, and he has not provided sworn testimony from these individuals.

The undisputed facts before the Court are that Sheriff Linder had no interaction with Mr. Wright during his incarceration; he did not directly supervise inmates or the guards in the units at the Facility; and he had no knowledge of a pending attack against Mr. Wright.  (Linder Affidavit, Doc. 69 at 2, ¶ 6.) Undersheriff Bofto also specifically testified that there was no documented animosity between Mr. Wright and Inmate Runs Above prior to the assault.  (Bofto Affidavit, Doc. 70 at 3, ¶ 7.)  There are no facts to indicate that any of the named County Defendants had any prior knowledge of the alleged violent propensities of Mr. Runs Above.  In short, there are no facts to suggest that a reasonable officer in the position of these officers would have appreciated the high degree of risk which Mr. Wright allegedly faced.

Defendants have met their burden of establishing a lack of genuine issues of material fact on Mr. Wright's failure to protect claim, and their motion for summary judgment on this claim should be granted.

## B.  Denial of Medical Care

Similarly, Mr. Wright has presented no facts that any named defendant made

an intentional decision to deny him adequate medical care; that the alleged denial

put Mr. Wright at substantial risk of suffering serious harm; that a defendant did

not take reasonable available measures to abate that risk; or that by not taking such

measures, a defendant caused Mr. Wright's injuries.

There is an issue of fact regarding when the actual assault occurred.  But

regardless of when the assault occurred, it is clear that Mr. Wright suffered facial

fractures as a result of the assault, and that he was provided medical care.  Two

nurses examined him on December 4, 2014 and prescribed Tylenol.  PA Caruso

examined Mr. Wright on December 5, 2014, and x-rays were done.  Mr. Wright

was also taken to the Billings Clinic on that date, and several doctors evaluated his

injuries at the emergency room.  PA Caruso evaluated Mr. Wright again on

December 8, 2014 and prescribed ibuprofen and Tylenol for ten days.  In addition,

PA Caruso requested a follow-up appointment with Dr. Horrell from the USMS.

Between December 13, 2014 and December 16, 2014, Mr. Wright filed a number

of complaints regarding pain, a lack of medications, and a follow-up visit.  He was

seen by a dentist on December 16 and PA Caruso on December 17.  PA Caruso

also followed-up again with the USMS regarding Mr. Wright's appointment with

Dr. Horrell.  Therefore, Mr. Wright's allegation that he was not provided with any

care between December 5 and January 2 is not supported by the record.

Further, there are no facts to support his allegation that the damage became

"life-threatening" as alleged in the Complaint.  (Doc. 1 at 8.)  In fact, there is a

complete absence of any evidence regarding what type of surgery was done, why it

was done, or the emergent basis of the surgery.  The only facts before the Court are

that Mr. Wright was seen by Dr. Horrell on January 2, 2015, and he underwent

surgery on January 7, 2015.

The record does indicate that Mr. Wright was supposed to be scheduled to

see Dr. Horrell in 7-10 days after the December 5, 2014 visit to the Emergency

room, and this appointment was not scheduled until January 2, 2015.  But there is

no indication that the named defendants were responsible for this delay,

 or that any such delay caused him harm.  *Shapley v. Nevada Bd. of State Prison*

*Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).  To establish a constitutional

violation, the harm caused by a delay in medical treatment need not be substantial.

*Wilhelm v. Rotman*, 680 F.3d 1113 at 1122 (9th Cir. 2012) (*citing Jett*, 439 F.3d at

1096; *McGuckin v. Smith*, 974 F.3d 1050, 1060 (9th Cir. 1992), *overruled on other*

*grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).  But Mr.

Wright has not submitted any evidence to suggest that the approximate three-week

delay in scheduling surgery caused harm.  The injuries to Mr. Wright were the

result of the attack against him.  Mr. Wright provides no evidence or explanation

as to how this delay caused his injuries to worsen.

Mr. Wright has thus presented insufficient evidence to establish that the

named defendants did not take reasonable available measures to abate a risk of harm to Mr. Wright or that the failure to take additional measures caused Mr. Wright's injuries.  Mr. Wright was assaulted in the jail which apparently caused extensive damage to his face.  Defendants attended to those injuries by taking him to the Emergency Room, continuing to evaluate him, providing him with ibuprofen and Tylenol, and scheduling him for surgery.  While the surgery was somewhat delayed, Mr. Wright has not provided any facts to suggest that any named Defendant caused that delay or that the delay caused him additional harm.

## IV.  CONCLUSION

Defendants have met their burden of proving "that there is an absence of evidence to support" Mr. Wright's claims.  *See Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Mr. Wright, in turn, utterly failed to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  There is a complete failure of proof concerning several essential elements of Mr. Wright's claims necessitating entry of summary judgment.  *See Celotex*, 477 U.S. at 322.  Mr. Wright provided no evidence to demonstrate that a reasonable jury could return a verdict in his favor.  See *Anderson*, 477 U.S. at 248. Defendants are entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

## ORDER

1.  Defendants Ready, Scott, Caruso, and Owens's Motion to Compel (Doc. 78) is DENIED AS MOOT in light of the recommendation to grant their motion for summary judgment.

2.  Defendants Ready, Scott, Caruso, and Owens's Motion to Strike (Doc. 80) is DENIED AS MOOT in light of the recommendation to grant their motion for summary judgment.

3.  Defendants Ready, Scott, Caruso, and Owens's Motion to Continue Deadline to File Motions (Doc. 82) is DENIED AS MOOT in light of the recommendation to grant their motion for summary judgment.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Caruso, Ready, Scott, and Owens' First Motion for Summary Judgment (Doc. 55) should be GRANTED.

2.  Defendant Linder's Motion for Summary Judgment (Doc. 66) should be GRANTED.

3.  Defendant Bofto's Motion for Summary Judgment (Doc. 73) should be GRANTED.

4.  Officer Munter's Motion for Summary Judgment (Doc. 76) should be

GRANTED.

5.  The Clerk should be directed to enter judgment and close this matter.

6.  The Clerk of Court should also be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. ⸹ 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed until entry of the District Court's final judgment.

DATED this 22nd day of April, 2020.

　　　　　　　　　　　　　_/s/ Timothy J. Cavan_
　　　　　　　　　　　　　Timothy J. Cavan
　　　　　　　　　　　　　United States Magistrate Judge

---

[4]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)." Therefore, since Mr. Wright is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.